SNELL & WILMER L.L.P.
Aliya L. Astaphan, Bar No. 340162
City National 2CAL
350 South Grand Avenue
Suite 3100
Los Angeles, California 90071-3420
Telephone: 213.929.2500
Facsimile: 213.929.2525
E: aastaphan@swlaw.com

*Attorneys for Plaintiff*
*Avnet, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Avnet, Inc., a New York corporation,<br><br>Plaintiff,<br><br>v.<br><br>Ampere Computing LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT;**<br><br>**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**(3) UNJUST ENRICHMENT;**<br><br>**(4) FRAUD IN THE INDUCEMENT/INTENTIONAL MISREPRESENTATION;**<br><br>**(5) NEGLIGENT MISREPRESENTATION;**<br><br>**(6) PROMISSORY ESTOPPEL**<br><br>Date Action Filed: April 10, 2025<br>Trial Date: N/A |

Plaintiff Avnet, Inc. ("Avnet") respectfully submits the following Complaint against Defendant Ampere Computing LLC ("Ampere") and requests that the Court enter judgment in its favor and against Ampere.

**INTRODUCTION**

1. This matter arises from an agreement between Plaintiff Avnet and Defendant Ampere relating to the purchase and distribution of computer processors and servers.

2. Specifically, in early 2021, Ampere was seeking ways to expand its revenues and market presence for its Altra processors, and came up with a strategy to issue purchase orders to original design manufacturers for barebone servers (L6) that could incorporate the Altra processors and then place those servers with original equipment manufacturers, system integrators, and end users.

3. To accomplish this plan, Ampere needed to place purchase orders for servers with a large third-party original design manufacturer named Gigabyte.

4. Given that Ampere was a recently created company, Gigabyte was unwilling to fulfill Ampere's desired purchase orders with favorable terms, leaving Ampere unable to accomplish its goals on its own.

5. Avnet is a longstanding company with a strong relationship with Gigabyte, and accordingly had much more favorable terms under which it could place purchase orders for the desired servers.

6. Ampere wanted to use Avnet's relationship with Gigabyte to secure the server purchase orders that Ampere could not accomplish on its own.

7. Avnet was only willing to place the purchase orders and thereby incur the risk that the servers would not get placed and sold, if Ampere agreed to purchase from Avnet 75% of all completed servers that were not sold or placed within 90 days of delivery.

8. Avnet would not have purchased the servers for millions of dollars, nor placed a large $4 million order for Ampere Altra processors, without having Ampere agree to purchase 75% of unsold completed servers.

9. Ampere explicitly "confirmed" in writing, in an email electronically signed by two Ampere representatives, that it agreed to the 75% repurchase arrangement to induce Avnet into placing the ~$4M order for Altra processors and the orders for servers from Gigabyte.

10. Ampere also made several additional oral and written representations that it had agreed upon the 75% repurchase arrangement.

11. When Ampere proved unable to place the servers that Avnet purchased from Gigabyte or develop and refer customers to Avnet for sales of those servers, Avnet submitted a request for the promised payment.

12. Instead of making the agreed-upon payment, Ampere refused to honor the parties' agreement or its prior representations, causing millions of dollars in damages to Avnet.

13. Ampere has similarly refused to honor a price protection provision in the parties' distribution agreement that requires Ampere to now credit Avnet $375,034.00 for products that Avnet previously purchased for which Ampere has now reduced the price.

14. Unable to obtain satisfaction from Ampere, Avnet brings this action to recover its damages caused by Ampere's numerous misrepresentations and breach of contract.

## PARTIES

15. Plaintiff Avnet, Inc. is a New York corporation with its principal place of business in Phoenix, Arizona.

16. Avnet is a global leader of electronic components and services, guiding makers and manufacturers in designing, making, supplying, and delivering technology solutions, including through use of its broad network of relationships and as a product distributor.

17. Phoenics Electronics is a former Avnet subsidiary that merged into Avnet on November 26, 2024, that is a global distributor of semiconductors, board-level solutions, servers and services. Phoenics and Avnet are sometimes collectively referred to herein as "Avnet."

18. Ampere Computing LLC is a Delaware limited liability company with its principal place of business in Santa Clara, California.

19. Ampere is a newly established semiconductor design company that was recently founded at the end of 2017.

AVNET, INC'S COMPLAINT

20. On information and belief, Ampere's managers and members are David Yoffie, Diana Taylor, Renee James, Edward Screven, Patrick McCarter, and Leslie Culbertson.

    a. Avnet is informed and believes, and on that basis alleges, that David Yoffie is an individual domiciled in Santa Clara, CA.

    b. Avnet is informed and believes, and on that basis alleges, that Diana Taylor is an individual domiciled in Santa Clara, CA.

    c. Avnet is informed and believes, and on that basis alleges, that Renee James is an individual domiciled in Santa Clara, CA.

    d. Avnet is informed and believes, and on that basis alleges, that Edward Screven is an individual domiciled in Santa Clara, CA.

    e. Avnet is informed and believes, and on that basis alleges, that Patrick McCarter is an individual domiciled in Menlo Park, CA.

    f. Avnet is informed and believes, and on that basis alleges, that Leslie Culbertson is an individual domiciled in Santa Clara, CA.

## JURISDICTION

21. This Court has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

22. This Court has personal jurisdiction over Ampere because its principal place of business is in the State of California and Avnet is informed and believes, and on that basis alleges, that Ampere is conducting business in the State of California.

## VENUE

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because Ampere's principal place of business is located in this district and Avnet is informed and believes, and on that basis alleges, that Ampere conducts a substantial amount of business in this district.

## DIVISIONAL ASSIGNMENT

24. Divisional Assignment in San Jose is proper pursuant to Civil Local Rule 3-2(c) and (e).

## GENERAL ALLEGATIONS

25. Avnet hereby incorporates by this refence all preceding paragraphs of this Complaint as though fully set forth herein.

26. This is an action for breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, fraud in the inducement/intentional misrepresentation, negligent misrepresentation, and promissory estoppel.

## THE PARTIES' DISTRIBUTORSHIP AGREEMENT

27. On or around May 5, 2004, Avnet and AMCC Sales Corporation (Ampere's contractual predecessor) entered into a Sales Distributor Agreement ("SDA") whereby Avnet was an authorized distributor of the production-released AMCC Power PC family of products.

28. On or around December 2017, AMCC divested its computer business, including the products distributed by Avnet under the SDA, which was then acquired by Ampere Computing LLC.

29. On or around December 2017, the SDA was assigned to Ampere.

30. In a 2021 amendment, Avnet and its then-subsidiary Phoenics were authorized distributors of Ampere's product line of processors, including the Ampere Altra processor family.

## AMPERE'S ALTRA PROCESSORS & PLANS TO EXPAND ITS MARKET BY MAKING PURCHASE ORDERS TO OXMs

31. Ampere develops computer processors and CPU cores under its "Altra" brand.

32. Phoenics initially built and delivered to Ampere Altra CPU based servers for original equipment manufacturers ("OEMs"), partners, and proof of concept ("POC") customers.

33. In the first quarter of 2021, however, Ampere's senior management and Phoenics' senior management engaged in discussions on a marketing strategy to rapidly expand the market reach of Ampere's Altra systems.

34. The key Ampere executives leading the marketing discussions were Kit Ho Chee (Ampere's Chief Revenue Officer), Sujan Kamran (general manager over original design manufacturers ("ODMs"), OEMs, and channel of distribution), and Bob Hoogenboom (director of sales).

35. Key Phoenics executives engaged in the Ampere marketing discussions were Peter Rooks (president) and Mike Green (director of applications engineering).

36. During the Ampere market strategy discussions, it was determined that the availability of barebone server (L6) pipeline was critical for Ampere's CPU revenue growth.

37. To accomplish this, Ampere needed to obtain a pipeline of purchase orders ("POs") for servers incorporating Ampere processors through ODMs such as Gigabyte.

38. In other words, the go to market strategy was for Ampere to place POs with ODMs and OEMs (referred to in combination as "OxMs") for servers that would integrate Ampere's processors, and those completed servers could then be placed on the market with OEMs, POCs, and others.

39. Ampere itself explained its marketing strategy in a document titled "Ampere – OxM System Supply Requirements."

40. To summarize, Ampere anticipated placing direct POs with Gigabyte for thousands of servers in 2021-2022, and would transfer those POs to multiple OEMs, System Integrators ("SIs") and other end users. But the success of this strategy required Gigabyte's commitment to fulfill Ampere's POs.

41. As a result of the then-recent COVID pandemic, at this time in 2021 there was a severe shortage of parts and supplies on the market, including servers. This shortage of servers required ODMs to selectively choose customers to whom they would fulfill purchase orders.

**AMPERE CANNOT PLACE PLANNED POs DIRECTLY TO GIGABYTE**

42. To implement the marketing strategy of placing Altra processors into the server pipeline, Ampere contacted Gigabyte to fulfill a PO for servers.

43. Gigabyte was unwilling to accept direct POs from Ampere unless Ampere agreed to certain business terms which Ampere was unwilling to accept. As a result, Gigabyte would not accept Ampere's POs.

44. Being thus unable to accomplish its marketing goals on its own, Ampere turned to Phoenics for assistance in placing Ampere's POs with Gigabyte.

## AMPERE SEEKS TO PLACE GIGABYTE POs THROUGH AVNET

45.     Unlike Ampere, Phoenics/Avnet has a well-established market presence of over 100 years, resulting in strong relationships with many OxMs, including Gigabyte.

46.     Because Ampere could not place POs directly to Gigabyte, Ampere discussed Phoenics placing those same POs to Gigabyte in order to obtain server supply and the more favorable terms available to Phoenics.

47.     Phoenics, however, was unwilling to accept the additional risk of placing the POs itself should those servers fail to sell on the market as expected.

48.     Accordingly, Phoenics would only agree to this fronting arrangement – whereby Phoenics would place the POs directly to Gigabyte instead of Ampere placing the POs itself – if Ampere would commit to repurchase 75% of servers that remained unsold after 90 days (the "Backstop").

## THE BACKSTOP

49.     After negotiating the Backstop details with Ampere, Phoenics provided a detailed explanation of the Backstop in a presentation made on April 16, 2021.

50.     On April 19, 2021, Phoenics provided Ampere with a copy of the Backstop presentation.

51.     The Backstop had the following components:

    a.     "If servers are not sold within 90 days of receipt, Ampere will be responsible for placing order on Phoenics for 75% of product built."

    b.     "Terms would be N30."

    c.     Phoenics "will always operate in a FIFO method to ensure that oldest inventory is used to minimize any backstop needs."

    d.     "At any time, this agreement can be cancelled with 90 days notice or less if the last order has a lead time of less than 90 days."

52.     To make the Backstop arrangement clear, under "Shared Liability" the presentation even included an example breakdown of Ampere's Backstop obligations based on projected POs, as follows:

     a.    "Orders would be placed for delivery by:

- July: 100

- Aug: 200

- Sept: 50

- Oct: 200

- Nov: 245"

     b.    "Out of 795 units, Ampere's backstop liability would be approximately:

- Oct: 75 units

- Nov: 150 units

- Dec: 35 units

- Jan: 150 units

- Feb: 185 units"

53. In April and May 2021, through Kit Ho Chee, Sujan Kamran, and Bob Hoogenboom, Ampere repeatedly confirmed both orally and in writing that Ampere agreed to the Backstop for Phoenics' POs to Gigabyte.

54. Based on that mutual agreement and in reliance on Ampere's representations, Phoenics held weekly and/or bi-weekly meetings with Ampere regarding the PO pipeline and PO placement.

55. Recognizing the representations and assurances made by Ampere, and how this fronting arrangement was founded upon the Backstop, some of those meeting invites from Ampere even included as the subject "Sync on 2nd Half PO's (Backstop Program)."

56. In a May 18, 2021 email, Bob Hoogenboom (Ampere) confirmed both Ampere's awareness of Phoenics' reliance on the Backstop, as well as Ampere's agreement to the Backstop: "With the upcoming system backstop proposal being executed and the subsequent aligning of SOC's with systems being placed/already on order – I am looking to have Phoenics place an order (2000-3000) SOC's scheduled out over the remainder of the year with Ampere."

57. Following a proposal from Ampere for Phoenics to purchase 3,001 Altra processors from Ampere, Phoenics sent its "counterproposal" on June 23, 2021.

58. To support a $4M PO from Phoenics for Altra CPUs that would be used in the servers, as requested by Ampere, Phoenics made an explicit condition that "[t]he backstop proposal is confirmed by Ampere."

59. In a June 25, 2021, email electronically signed by "Sujan and Bob," Ampere unequivocally responded to Phoenics' counterproposal as follows (emphasis added):

> Peter and Mike,
>
> Let me make a comment to echo what you both said on Wednesday – **this relationship is all about trust** – bottom line we trust you and vice versa **you have trust in us** – **we are in this together** and have been working closely together the past 8+ months – time to execute and sell, sell, sell
>
> Please see our responses to the Phoenics Proposal.
>
> . . .
>
> 5. **The Backstop proposal is confirmed by Ampere**
>
>    Ampere response:  **Confirmed. Will send separately.**
>
> Thanks again for your partnership – with **agreement with the above** I will work with Mike and his team on executing the 500 unit PO/SOC delivery and the 3001 overall blanket PO.
>
> Best, Sujan and Bob

**AMPERE AND AVNET MOVE FORWARD WITH THE BACKSTOP IN PLACE**

60. In reliance upon Ampere's representations regarding the Backstop, its written confirmation signed by two Ampere representatives, and Ampere's insistence that Phoenics needed to "trust" Ampere and its representations, Phoenics placed PO No. 7024340 to Ampere in the amount of $4,016,085.00 for 3,000 Altra processors, and multiple POs to Gigabyte for servers.

61. Phoenics would not have made these POs for millions of dollars if not for the Backstop that Ampere repeatedly "confirmed" in writing had been agreed upon.

62. This fronting arrangement, whereby Phoenics would place server POs to Gigabyte in lieu of Ampere placing those POs, was only meant to be short term until Ampere could develop enough good will with Gigabyte to get its own favorable terms.

63. Thus, after placing server POs with Gigabyte, Phoenics continued advocating on Ampere's behalf to Gigabyte so that in the long term Ampere could directly place the server POs to Gigabyte and Phoenics could remove itself from the process.

64. Phoenics eventually arranged for an October 1, 2021, conference call between Gigabyte, Ampere, and Phoenics, to give Ampere the opportunity to make its case on its marketing and channel growth and to convince Gigabyte to allow Ampere to place the POs directly.

65. Ultimately, Ampere could not persuade Gigabyte, resulting in Ampere's continued reliance on Phoenics to place the POs under the promised protections of the Backstop.

66. Based on the parties' mutual agreement and Ampere's representations, Ampere and Phoenics moved forward with the Backstop program, whereby Phoenics placed POs with Ampere and Gigabyte under a program where Ampere would purchase from Phoenics 75% of POs that did not sell within 90 days.

67. Despite efforts to place the servers, Phoenics' inventory of servers and Altra processors began piling up.

**AMPERE REFUSES TO HONOR THE AGREED-UPON BACKSTOP**

68. After allowing Ampere additional time to market and sell the servers, by June 2023 it became apparent that Phoenics would be unable to offload its supply of servers, with well over $4-5 million in inventory beyond the 90 days agreed upon as part of the Backstop.

69. Following several discussions, Ampere decided that it would not honor the Backstop arrangement.

70. In a letter dated December 8, 2023, Phoenics noted Ampere's "refusal to honor its backstop agreement with Phoenics Electronics Corp."

71. In this letter Phoenics reminded Ampere that "Ampere did not have a strong relationship with Gigabyte but Phoenics, which did have such a relationship, was in a position to support the desired server requirements and put itself out on a limb to help ensure Ampere's sales growth."

72. On December 21, 2023, Ampere responded by denying "that Ampere entered into any backstop 'agreement' or has any obligation to repurchase Ampere product from Phoenics Electronics as alleged in your letter."

73. Ampere's refusal to honor its numerous verbal and written representations and assurances, including wherein Ampere "confirmed" that it agreed to the Backstop in an email signed by two high-level executives at Ampere, have now forced Avnet to bring this action to recover millions of dollars in damages resulting from Ampere's breaches and misrepresentations.

## AMPERE ALSO REFUSES TO HONOR THE SDA'S PRICE PROTECTION PROVISIONS

74. In addition to its failure to honor the Backstop, Ampere has also refused to honor the SDA's price protection provisions.

75. Specifically, the SDA provides under Section 7(B) that "[i]n the event Ampere decreases the price of any Product, Distributor shall be entitled to a credit equal to the difference between the price paid for the Product by Distributor, less any prior credits granted by Ampere on such Products, and the new decreased price for the Product, multiplied by the quantity of such Product in Distributor's inventory on the effective date of the decrease."

76. Section 7 requires Avnet to submit to Ampere, "not later than sixty (60) working days after receiving notice of such price decrease, after the effective date of such price decrease, a Product inventory report as of the effective date."

77. On June 28, 2023, Ampere provided Avnet with notice of price decreases for certain Ampere products that would become effective on July 1, 2023.

78. In July 2023, well within the 60-day time period allowed by the SDA, Avnet provided to Ampere a product inventory report for the products subject to the price decrease.

79. As set forth in the product inventory report, the SDA's price protection provision entitled Avnet to $375,034.00 credit for the pricing difference based on Avnet's July 1, 2023 inventory.

80. Similar to Ampere's refusal to honor its Backstop obligations, Ampere has refused to honor the SDA's price protection provision and has failed to credit Avnet the $375,034.00.

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract)**

81. Avnet hereby incorporates by this reference all preceding paragraphs of this Complaint as though fully set forth herein.

82. Avnet and Ampere entered into the SDA.

83. Avnet and Ampere also entered into an agreement to negotiate the Backstop agreement in good faith, and the Backstop agreement itself.

84. Avnet substantially performed its duties and obligations under the SDA and the Backstop agreement.

85. Ampere breached the Backstop agreement and the SDA by failing to make millions of dollars in payments required under the Backstop agreement and SDA for the servers and the price protection adjustment.

86. Ampere breached its agreement to negotiate the Backstop agreement in good faith by "confirming" the Backstop agreement in a writing that was electronically signed by high-level executives, in order to secure a $4M PO from Avnet, and promising to send an additional formal writing confirming what had already been confirmed in writing, acting and communicating in conformity with the Backstop agreement as though it were in place, before later asserting that no Backstop agreement was reached because Ampere had not sent an additional written confirmation.

87. Avnet has suffered and continues to suffer damages as a result of Ampere's breaches.

88. As a direct and proximate result of Ampere's breaches, Avnet has been damaged in an amount to be determined at trial, but no less than $3.3 million, in addition to pre- and post-judgement interest and attorney's fees.

**SECOND CLAIM FOR RELIEF**

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

89. Avnet hereby incorporates by this reference all preceding paragraphs of this Complaint as though fully set forth herein.

90. The Backstop agreement and SDA, individually and collectively, contain implied covenants of good faith and fair dealing which require of Ampere honesty in fact and the observance of reasonable commercial standards.

91. Ampere's conduct breached the implied covenant of good faith and fair dealing, including by making bad-faith attempts to formulate product price decreases in a manner to avoid Avnet's price protection, by continuing to induce Avnet to make POs while also attempting to avoid the already agreed-upon Backstop, by pretending a future additional formal agreement was forthcoming, and by its conduct set forth in paragraphs 48-80 above.

92. As a direct and proximate result of Ampere's breaches of its implied covenant of good faith and fair dealing, Avnet has been damaged in an amount to be determined at trial, but not less than $3.3 million, in addition to pre- and post-judgement interest and attorney's fees.

### THIRD CLAIM FOR RELIEF

### (Unjust Enrichment)

93. Avnet hereby incorporates by this reference all preceding paragraphs of this Complaint as though fully set forth herein.

94. At the expense of Avnet, Ampere received the benefits of Avnet's performance under the Backstop agreement and SDA.

95. Among other benefits, Ampere obtained from Avnet the $4 million PO for Altra processors, received proceeds of sales of CPUs to Avnet, received proceeds from sales of servers with Altra processors, avoided onerous terms for Gigabyte POs, and avoided a planned PO for thousands of servers that would have resulted in their direct payment of millions of dollars in product that would not be sold. The total value of the benefits will be determined at trial but are not less than $3.3 million.

96. As set forth in paragraphs 48-80 above, Ampere engaged in wasteful, misleading, deceitful, or otherwise improper conduct that would make it unjust for it to retain the above benefits without repaying said benefits to Avnet.

AVNET, INC'S COMPLAINT

## FOURTH CLAIM FOR RELIEF

### (Fraud in the Inducement/Intentional Misrepresentation)

97. Avnet hereby incorporates by this reference all preceding paragraphs of this Complaint as though fully set forth herein.

98. Ampere made numerous representations, both orally and in writing, that Ampere believed the parties had entered into the Backstop agreement, that Avnet's $4 million PO to Ampere was treated by Ampere as being under the Backstop, that Avnet's POs to Gigabyte for servers was treated by Ampere as being under the Backstop, that all servers received from Gigabyte pursuant to those POs were treated by Ampere as being subject to the Backstop, and that Ampere would send an additional formal written confirmation of the Backstop.

99. Ampere knew that its statements and representations were false at the time it made them.

100. Ampere made these representations with the intent to induce Avnet into making a $4 million PO for Ampere processors, to induce Avnet into placing multiple POs for servers from Gigabyte, and to induce Avnet into helping Ampere market and place its Altra processors.

101. Avnet justifiably relied upon Ampere's representations, to Avnet's detriment, in placing the $4 million PO for Ampere processors, placing multiple POs for servers from Gigabyte, and helping Ampere to market and place its Altra processors.

102. As a result of Ampere's fraudulent representations Avnet has been damaged in an amount to be determined at trial, but no less than $3.3 million, including but not limited to the amounts Avnet paid for the servers and amounts Avnet paid for Ampere processors, in addition to other amounts and pre- and post-judgment interest and attorney's fees.

## FIFTH CLAIM FOR RELIEF

### (Negligent Misrepresentation)

103. Avnet hereby incorporates by this reference all preceding paragraphs of this Complaint as though fully set forth herein.

104. Ampere made numerous representations, both orally and in writing, that Ampere believed the parties had entered into the Backstop agreement, that Avnet's $4 million PO to Ampere

AVNET, INC'S COMPLAINT

was treated by Ampere as being under the Backstop, that Avnet's POs to Gigabyte for servers was treated by Ampere as being under the Backstop, that all servers received from Gigabyte pursuant to those POs were treated by Ampere as being subject to the Backstop, and that Ampere would send an additional formal written confirmation of the Backstop.

105. Ampere did not have reasonable grounds for believing these statements to be true when it made them.

106. Ampere made these representations with the intent that Avnet rely on them in making a $4 million PO for Ampere processors, placing multiple POs for servers from Gigabyte, helping Ampere market and place its Altra processors.

107. Given Ampere's repeated confirmations, both orally and in writing, that Ampere agreed to the Backstop, Avnet's reliance on Ampere's representations was justified.

108. Avnet justifiably relied upon Ampere's representations, to Avnet's detriment, in placing the $4 million PO for Ampere processors, placing multiple POs for servers from Gigabyte, and helping Ampere to market and place its Altra processors.

109. As a result of Ampere's misrepresentations Avnet has been damaged in an amount to be determined at trial, but no less than $3.3 million, including but not limited to the amounts Avnet paid for the Gigabyte servers and amounts Avnet paid for Ampere processors, in addition to other amounts and pre- and post-judgment interest and attorney's fees.

## SIXTH CLAIM FOR RELIEF

**(Promissory Estoppel)**

110. Avnet hereby incorporates by this reference all preceding paragraphs of this Complaint as though fully set forth herein.

111. Ampere made a clear and unambiguous promise that it would purchase from Avnet 75% of any servers that Avnet purchased from Gigabyte that were not placed within 90 days of delivery.

112. Ampere made a clear and unambiguous promise that it would send additional formal written confirmation that the parties had entered into the Backstop.

113. Avnet relied upon Ampere's promises, to Avnet's detriment, in placing the $4 million PO for Ampere processors, placing multiple POs for servers from Gigabyte, and helping Ampere to market and place its Altra processors.

114. Avnet's reliance was both foreseeable and reasonable.

115. Avnet was injured as a result of its reasonable and foreseeable reliance on Ampere's promises in an amount to be determined at trial, but no less than $3.3 million, including but not limited to the amounts Avnet paid for the servers and amounts Avnet paid for Ampere processors, in addition to other amounts and pre- and post-judgment interest and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Avnet, Inc., respectfully requests that the Court enter judgment in its favor and against Defendant Ampere Computing LLC, as follows:

1. A declaratory judgment finding and concluding at a minimum: Avnet met all duties and obligations under the Backstop agreement and SDA, and Ampere materially breached the Backstop agreement and SDA;

2. For all actual damages, reasonable compensatory damages, consequential damages, lost profits, and incidental damages in an amount to be determined at trial, but no less than $3.3 million;

3. For all costs of suit, expert witness fees, investigation costs, and reasonable attorney's fees as provided for by statute, court rule, contract, or this Court;

4. For pre- and post-judgment interest on any award of damages to the extent allowed by law or contract; and

5. For all such other and further relief as the Court deems just and proper.

//
//

AVNET, INC'S COMPLAINT

Dated: April 10, 2025

SNELL & WILMER L.L.P.

By: /s/ Aliya L. Astaphan
    Aliya L. Astaphan

*Attorneys for Plaintiff*
*Avnet, Inc.*